## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

BERNARD D. WILSON,

  Plaintiff,

v.            Case No.  4:18-cv-310-RH-MJF

TOREY JOHNSON, et al.,

  Defendants.

_____/

## REPORT AND RECOMMENDATION

This prisoner civil rights case arises out of an inmate-on-inmate assault that occurred at Liberty Correctional Institution on January 6, 2018. Defendants Torrey Johnson, William Stephens, Melissa Comerford, Larry Childs, James Revell, Tyler Johnson, and Heath Flanagan move for summary judgment on several of Plaintiff's claims. (Doc. 69). Plaintiff Wilson has responded in opposition to the motion. (Doc. 79). The undersigned recommends that Defendants' motion for summary judgment be granted in part and denied in part, and that this case proceed to trial on two claims: (1) Wilson's Eighth Amendment individual-capacity claim for compensatory and punitive damages against Defendant Tyler Johnson; and (2) Wilson's First

Amendment individual-capacity claim for nominal damages against Defendant Flanagan.[1]

## I. Background and Procedural History

Wilson initiated this action on June 28, 2018, by filing a civil rights complaint under 42 U.S.C. § 1983. (Doc. 1 at 18 in ECF; *see also* Doc. 2 at 4 (institutional date stamp on accompanying motion to proceed *in forma pauperis*)). Wilson's complaint names as Defendants eight prison staff at Liberty CI: a nurse (Nurse Lockhart) and seven prison security officials (Warden Torrey Johnson, Assistant Warden William Stephens, Major Larry Childs, Classification Supervisor Melissa Comerford, Sergeant James Revell, Officer Tyler Johnson, and Sergeant Heath Flanagan). Hereafter, Defendant Warden Torrey Johnson is referred to as "Warden Johnson," and Defendant Officer Tyler Johnson is referred to as "Officer Johnson." The Defendants are sued in their individual and official capacities for monetary damages and injunctive relief. (Doc. 1 at 14 ¶ 18).

Wilson claims that Warden Johnson, Stephens, Comerford, Childs, Revell, and Officer Johnson violated his rights under the Eighth and Fourteenth Amendments when they failed to protect him from three inmates (Sadrack Cleus,

---

[1] The court referred this case to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b).

Dedric Towns and Sylvester Eleby). According to Wilson, these three inmates attacked him on September 22, 2017, and, as a result of the defendant security officials' deliberate indifference to his safety, Inmate Cleus attacked him again on January 6, 2018. (Doc. 1 at 14-16 ¶¶ 20-26; Doc. 1 at 18). Wilson claims that Defendant Flanagan violated his rights under the First and Fourteenth Amendments when he retaliated against Wilson for filing a grievance and preparing a lawsuit against those officers who failed to protect him. (Doc. 1 at 16 ¶ 27). Wilson claims that Defendant Nurse Lockhart was deliberately indifferent to his injuries after the second attack, in violation of the Eighth and Fourteenth Amendments. (Doc. 1 at 11-13, ¶¶ 13-15).

As relief for his alleged constitutional injury, Wilson seeks $50,000 in compensatory and punitive damages; $1.00 in nominal damages; an injunction barring the FDC from housing him in a Region 1 or Region 2 facility "due to fear of retaliatory acts;" and attorney's fees in the amount of $10,000. (Doc. 1 at 18). Wilson currently is incarcerated at Charlotte Correctional Institution, which is a Region 2 facility. *See* www.dc.state.fl.us.

On December 30, 2019, this court dismissed Wilson's claim against Nurse Lockhart on the grounds that Wilson abandoned the claim and that the claim properly would be dismissed anyway for failure to exhaust administrative remedies. (Doc. 82 (order of dismissal); Doc. 83 (judgment)). The remaining Defendants move for

summary judgment under Rule 56 of the Federal Rules of Civil Procedure, on these grounds: (1) the Eleventh Amendment bars Wilson's official capacity claims for damages; (2) Wilson is not entitled to the injunctive relief he seeks; (3) Wilson fails to state a cause of action under the Fourteenth Amendment against any Defendant; (4) Wilson fails to state a cause of action under the Eighth Amendment against Warden Johnson, Childs, Comerford, Stephens, and Revell; (5) Wilson fails to state a cause of action under the First Amendment against Flanagan; (6) Warden Johnson, Childs, Comerford, Stephens, Revell, and Flanagan are entitled to qualified immunity; (7) Wilson is barred by 42 U.S.C. § 1997e(e) from recovering compensatory and punitive damages; and (8) Wilson is not entitled to attorney's fees. (Doc. 69).

## II.    Facts

### A.    <u>Florida Department of Corrections' Rules Relevant to Wilson's Claims</u>

Wilson's complaint and the evidence in the summary judgment record refers to various institutional terms and procedures. Those various terms and procedures are defined here.

The Florida Department of Corrections' inmate classification system "is comprised of two primary operational components which have been established to provide uniformity and consistency in both the development and implementation of

classification policies and procedures." Fla. Admin. Code r. 33-601.209(1). These two components are "the State Classification Office and the Institutional Classification Team." *Id*. These two components "[have] responsibility relative to the operation and management of the inmate classification system." *Id*.

The Institutional Classification Team, in particular, "is responsible for making work, program, housing and inmate status decisions at a facility and for making other classification recommendations to the State Classification Office (SCO)." Fla. Admin. Code r. 33-601.209(3). The SCO "refers to the office or office staff at the central office level that is responsible for the review of inmate classification decisions." Fla. Admin. Code r. 33-601.209(2). The SCO's duties "include approving, disapproving, or modifying Institutional Classification Team (ICT) recommendations." *Id*. The SCO, exclusively, makes the final determination whether an inmate should be placed in Protective Management. Fla. Admin. Code r. 33-602.220(3)(c)(5).

Special Review is "the classification status assigned to inmates who pose a potentially serious threat to other inmates or staff or who pose a risk to the security and order of an institution." Fla. Admin. Code r. 33-601.211(1). A Special Review designation "ensure[s] that the inmates are tracked and housed to minimize potential conflict." Fla. Admin. Code r. 33-601.211(2). Special review status is assigned "only in cases in which the circumstances are serious and expected to be long-term in

nature." Fla. Admin. Code r. 33-601.211(3). "The Bureau of Classification and Central Records is responsible for verifying, documenting, approving and assigning special review status." Fla. Admin. Code r. 33-601.211(4). "The facility housing the special review inmate shall ensure that documentation related to the inmate is processed and maintained as current." Fla. Admin. Code r. 33-601.211(5).

Protective Management (PM) "refers to the separation of an inmate from the general population in a structured environment for purposes of safety, security, and order of the facility." Fla. Admin. Code r. 33-602.221(1)(j). The treatment of inmates in protective management "shall be as near that of the general population as the individual inmate's safety and security concerns permit." Fla. Admin. Code r. 33-602.221(2)(a). Inmates in close management or disciplinary confinement are not eligible for placement in protective management. Fla. Admin. Code r. 33-602.221(2)(b). If it is determined that an inmate in close management or disciplinary confinements needs protection, "the inmate will be afforded such protection in his or her current status." Fla. Admin. Code r. 33-602.221(2)(c).

Close Management (CM) is "the confinement of an inmate apart from the general population, for reasons of security or the order and effective management of the institution, where the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others." Fla. Admin. Code r. 33-601.800. CMI is "the most restrictive single cell

housing level of all the close management status designations." Fla. Admin. Code r. 33-601.800(2)(a)(1). CMII is "restrictive cell housing, which may or may not be restricted to single cell housing." Fla. Admin. Code r. 33-601.800(2)(b).

Disciplinary confinement "refers to a form of punishment in which inmates . . . are confined for specified periods of time to individual cells." Fla. Admin. Code r. 33-602.222(1)(f).

Security Threat Group (STG) "refers to formal or informal ongoing inmate/offender groups, gangs, organizations, or associations consisting of three or more members" who have one or more of the following characteristics:

1.  A common name or common identifying signs, colors, or symbols;

2.  Members or associates who individually or collectively engage in or have engaged in a pattern of gang activity, criminal activity, or Department rule violations; or

3.  Potential to act in concert to pose a threat or potential threat to the public, staff, visitors, other inmates or offenders, or the secure and orderly operations of an institution, probation office, other Department property, or Department activity or function.

Fla. Admin. Code r. 33-800(1)(s).

### B.   Fact Underlying Wilson's Eighth Amendment Deliberate Indifference Claims

The following facts are drawn from the evidence in the summary judgment record (Doc. 69), Wilson's verified complaint (Doc. 1), and Wilson's sworn

response in opposition to the motion for summary judgment. (Doc. 79).[2] Where the parties offer conflicting accounts of the events in question, the court "sets forth the facts, drawn from the evidence presented, in the light most favorable to the plaintiff." *See Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262, 1265 (11th Cir. 2005). Matters stated as "facts" for purposes of summary judgment review may not be the actual facts. *See Montoute v. Carr*, 114 F.3d 181, 182 (11th Cir. 1997). References to the "Defendants" are to those seven Defendants moving for summary judgment.

On September 22, 2017, Wilson was attacked by Inmate Sadrack Cleus and two of Cleus's associates—Inmates Dedric Towns and Sylvester Eleby. (Doc. 1 at 6 ¶ 1; Doc. 69, Attach. 4, Ex. D (Use of Force Report #17-17208; Doc. 69, Attach. 9, Ex. I, Special Review memorandum)).[3] Cleus hit Wilson in the head with a "lock & sock" and then Cleus and Towns stabbed Wilson with knifes and a broken light bulb. Wilson gained possession of one knife and fought back. (Doc. 1 at 6 ¶ 1; Doc. 69, Attach. 4, Ex. D). Officers used chemical agents to quell the disturbance. (Doc. 69,

---

[2] "A *pro se* plaintiff's complaint, . . . if verified under 28 U.S.C. § 1746, is equivalent to an affidavit, and thus may be viewed as evidence. Nevertheless, '[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge.'" *Howard v. Memnon*, 572 F. App'x 692, 694 (11th Cir. 2014) (*citing Murrell v. Bennett*, 615 F.2d 306, 310 n.5 (5th Cir. 1980), and quoting Fed. R. Civ. P. 56(c)(4)) (footnote omitted).

[3] The page numbers cited in this report and recommendation refer to numbers assigned by the court's electronic docketing system.

Attach. 4, Ex. D). Both Wilson and Cleus sustained multiple injuries that required medical treatment. (Doc. 1 at 6 ¶ 1; Doc. 69, Attach. 4, Ex. D).

After the fight, prison officials prepared a Use of Force Report (Use of Force Report #17-17208) and Incident Reports (Incident Report #120-17-09-2712 and Incident Report #120-17-09-2293). (Doc. 69, Attach. 4, Ex. D). Incident Report #120-17-09-2712 focuses more on the inmate altercation, while Report #120-17-09-2293 focuses more on the use of chemical agents to quell the disturbance. (Doc. 69, Attach. 4, Ex. D).

Officer Dalton Colburn initiated Incident Report #120-17-09-2712. The Report includes: (1) Dalton's description of the September 22, 2017, altercation; (2) comments by the Shift supervisor (Captain Marcus Locke); (3) review by the Correctional Officer Chief (Colonel Angie Johnson), and review by Defendant Warden Johnson. (Doc. 69, Attach. 4, Ex. D at 5-6).[4] Officer Colburn described the altercation as follows:

> On 9-22-17, I was assigned as B-Dormitory Officer. At 11:17pm, I heard a commotion coming from the B1-Bathroom. Upon inspection I observed Inmate Wilson, Bernard DC#T24935, Inmate Towns, Dedric DC#X91798 and Inmate Cleus, Sadrack DC#J5790 fighting. I initiated ICS. The inmates continued fighting and moved into the bedding area. A-Team arrived and instructed the inmates to cease their actions. At this time, I observed Inmate Wilson attempt to attack another inmate and observed Sergeant John Shuler administer chemical

---

[4] Neither Officer Colburn, Captain Locke, nor Colonel Johnson is a party to this lawsuit.

agents toward Inmate Wilson. After Inmate Wilson ceased his actions, I observed Inmate Towns pick up a light bulb and attempt to attack Inmate Wilson with it. At this time, Sergeant Richard Cooper administered chemical agents to compel Inmate Towns to cease his actions. All inmates complied with orders given and all force ceased.

(Doc. 69, Attach. 4, Ex. D at 5).

Captain Locke provided these comments:

This incident appears to be STG related. Several inmates were interviewed and they stated "Gang stuff". Inmate Wilson was evaluated by medical with multiple injuries; see attached DC4-708. Inmate Wilson is a suspected member of the STG Group "Bloods". Inmate Wilson['s] DR history is attached. Inmate Towns was evaluated by medical, no injuries noted. Inmate Towns has no documented STG affiliation. Inmates Towns' DR history is attached. Inmate Cleus was evaluated by medical with multiple injuries noted; see attached DC4-708. Inmate Cleus has no documented STG affiliation. Inmate Cleus['s] DR history is attached. After review of the camera it was discovered that Inmate Eleby, Sylvester DC#K77423 was attacked by Inmate Wilson. Inmate Eleby was placed into administrative confinement pending investigation. Inmate Eleby has no documented STG affiliation. Inmate Eleby's DR history is attached. The weapons were recovered, photographed and attached. Inmate Wilson was placed in administrative confinement pending a DR for 1-10 Aggravated battery on an inmate and 2-4 Fighting. Inmate Towns was placed in administrative confinement pending a DR for 1-10 Aggravated battery on an inmate and 2-4 Fighting. Inmate Cleus was placed in administrative confinement pending a DR for 2-4 Fighting. Forward to the Chief of Security for review.

(Doc. 69, Attach. 4, Ex D at 5-6).

The Chief of Security, Colonel Angie Johnson, provided these instructions:

Forward to Ofc McMillan to ensure all DRs are processed. M. Nobles, complete MINS Report.

cc: Ofc McMillan
    M. Comerford
    M. Nobles
    Sgt. Pumphrey

(Doc. 69, Attach. 4, Ex. D at 5).

On September 25, 2017, Defendant Warden Johnson reviewed the incident report and instructed:

> Recommend CM referrals for inmates Wilson, Towns and Cleus. Also, a Special Review should be initiated between I/M Wilson and I/Ms Towns & Cleus.
>     cc: Capt. Locke – Ensure DR's are processed.

(Doc. 69, Attach. 4, Ex. D at 5).

On September 24, 2017, Wilson, while in administrative confinement, informed Captain Marcus Locke that he was in fear for his life because: "The Zoe put a hit out on me." (Doc. 1 at 7 ¶ 4; Doc. 69, Attach. 10, Ex. J at 15). To support his claim, Wilson submitted this witness statement, dated September 23, 2017:

> On the night of Sept. 22, 2017, as I was using the restroom in B-1 I was attacked by an inmate who rushed into the restroom & slapped me in the side of the head with a lock & sock. I started to run out of the restroom but noticed the exit was blocked by another I/M bearing a knife. I turned and noticed the first I/M (who hit me with the lock) now has a bigger knife and the lock so I took the garbage can and rushed the one with the biggest weapon, he swung the lock but it wrapped around my wrist and dropped. He stabbed me under my armpit. I grabbed his arm and we tussled for the knife, all the while the fat inmate is stabbing me in the back and neck. I then gain[ed] possession of the shank and began to fight back in a life or death situation! I in no way initiated nor instigated this incident. This was clearly a self-defense tactic on my

part. Off. Co[l]burn stated that he witnessed majority of the incident
absent the very beginning and that yes, it was self-defense on my part
but the shank makes it look bad. But I only got the knife from my
attackers. This was not a fight but instead a hit put on me by the ZOES
(gang). I refused the first witness statement because I was in pain and
couldn't write. However, this is the truth of what occurred. The video
will show me preparing a soup (meal) to eat s[e]tting it on the water
fountain (the time leading up to the incident it will not show me having
<u>any</u> confrontation with no one) and then calmly going into the restroom,
and then the little black guy rushing into the bathroom behind me him
[sic] and Towns. I can understand me with the knife being an assault
but again I was forced to defend myself from <u>extreme</u> <u>life</u> <u>threatening</u>
<u>danger</u>! My defense is <u>self-defense</u>. I've never been in any gang and
never will so I'm more subject to being robbed or put down on. The
entire time other inmates were encouraging my attackers to "kill that
nigga"!! This was also heard by Off. Co[l]burn. This gives more credit
to my defense. I did not want to die so I fought for my life! If I'm wrong
allow God to judge me! Again this was not a fight!! I was attacked and
assaulted!! I just defended myself and stood my ground!!

(Doc. 69, Attach. 10, Ex. J at 17) (emphasis in original).

On September 24, 2017, Locke prepared an Incident Report (Incident Report

#120-17-09-2720) documenting Wilson's statement that he was in fear for his life.

Locke reported:

Inmate Wilson completed a DC6-112C containing additional
information and is attached. A PM Worksheet was also completed and
is attached. Inmate Wilson will remain in Administrative Confinement
pending a PM investigation. Inmate Wilson was involved in a fight on
09/22/17 with several suspected gang members. Inmate Wilson's last
request for protection was on 10/28/16. Forwarded to Chief of Security
for review.

(Doc. 69, Attach. 10, Ex. J at 15).

Colonel Angie Johnson reviewed Locke's report on September 25, 2017, and instructed:

> Forward to Ofc McMillan to ensure PM investigation completed.
>
> cc: M. Comerford
>     Ofc McMillan
>     Sgt. Pumphrey

(Doc. 69, Attach. 10, Ex. J at 15).

Warden Johnson reviewed Locke's report on September 25, 2017, and instructed:

> Colonel Johnson please review video footage for supporting documentation, forward to ICT for review for protection needs.
>
> cc: Co. Johnson
>     ICT

(Doc. 69, Attach. 10, Ex. J at 15).

On September 29, 2017, Officer Deante McMillian[5] completed a Protective Management investigation and reported the following:

> During the interview, Inmate Wilson stated he is in fear of his life at Liberty CI Main Unit due to he got attacked by gang members of the "Zoë's". Inmate Wilson stated, "The head of the "Zoe's" Inmate Eleby, Sylvester DC#K77423 had to [have] initiated the hit out on his head because they wouldn't make a move without his permission.["] Inmate Wilson stated he do [sic] not know why there was a paid hit out on his head or why they came after him due to he claims to be a neutron and can't stand the sight of a gang member because all of them are cowards.

---

[5] McMillian is not named as a defendant in this case.

> I reviewed Inmate Eleby's CDC files and found he has no documented STG Security Threat Group affiliation. I interviewed Inmate Eleby, who had no comment on this issue and refused to make a statement. I further question[ed] Inmate Wilson if he knew of any other names that he feels might want to hurt him and he stated he does not know any other names of inmates. I reviewed Inmate Wilson's CDC files and found he is a suspected member of STG "Bloods". All documents derived from this investigation will be forwarded to classification. Inmate Wilson's [sic] has no tentative release date (Life) and will remain in administrative confinement pending a review from ICT.

(Doc. 69, Attach. 10, Ex. J at 5).

Prior to the ICT conducting a hearing on Wilson's request for Protective Management, Senior Classification Officer Robert Bulzer initiated the Special Review process.[6] On October 2, 2017, Bulzer issued this recommendation to the ICT:

> It is recommended that inmates Wilson, Bernard DC #T24935; Towns, Dedric, DC #X91798; Cleus, Sadrack DC #J57920 and Eleby, Sylvester DC #K77423 be special reviewed against each other. On September 22, 2017, inmates Wilson; Towns; Cleus and Eleby were observed attacking each other with homemade weapons constructed of plexi glass and a broken light bulb. During an investigation of the incident and camera review, inmate Wilson was observed on fixed wing camera attempting to stab inmate Eleby. Based on the circumstances of the incident, it is recommended that all of the involved inmates be housed at separate facilities.

(Doc. 69, Attach. 9, Ex. I). Bulzer's memorandum attached a copy of the Incident Report #120-17-09-2712 detailing the September 22, 2017, incident, except that the

---

[6] Bulzer is not named as a defendant in this case.

last four digits of the report number appear as "2283." (*Id*.). ICT Representatives Defendants Stephens, Childs, and Comerford approved the Special Review recommendation. (*Id*.). The SCO approved the Special Review designations. (*Id*.). There is no evidence when the Special Review designations were entered into the FDC's electronic database. (*See* Doc. 69, Attach. 8, Ex. H at 7).[7] There also is no evidence concerning the manner in which a Special Review designation is communicated to prison staff. Wilson remained housed in administrative confinement. (Doc. 69, Attach. 8, Ex. H at 3).

On October 4, 2017, ICT representatives Defendants Stephens, Childs, and Comerford held a hearing on Wilson's request for Protective Management. (Doc. 1 at 8 ¶ 5; Doc. 69, Attach. 10, Ex. J at 5). Wilson was present at the hearing. (*Id.*). According to Wilson, he "again, iterated to the team his reason for fear and the events that took place on Sept. 22, 2017." (Doc. 1 at 8 ¶ 5).

On October 4, 2017, Defendants Stephens, Childs, and Comerford recommended to the State Classification Office that Wilson's request for protective management be disapproved, explaining:

_____

[7] As of June 6, 2019, the FDC's electronic database reflected that Wilson was to be kept away from five other inmates for his own protection, including Cleus and Towns. (Doc. 69, Attach. 8, Ex. H at 7). The database reflected that Wilson was to be kept away from four additional inmates because he was a threat to them, including Sylvester Eleby. (*Id*.). The database printout does not indicate the date the information was entered. (*Id*.).

Page 15 of 52

> Inmate was present before ICT for his protection hearing. ICT recommends that Inmate's request for PM be disapproved due to Inmate Eleby, Sylvester DC# K77423 being transferred from Liberty CI on 10-04-17; resolving Inmate Wilson's protection issues. It should be noted that Inmate Wilson is currently being referred for placement in Close Management unit.

(Doc. 69, Attach. 10, Ex. J at 5). On October 9, 2017, the SCO disapproved Wilson for Protective Management. (*Id.*). That same day, Wilson was informed of the SCO's decision and chose not to appeal to the Office of the Secretary. (Doc. 69, Attach. 10, Ex. J at 4). Wilson acknowledged that he understood that his decision not to appeal meant that he would be released from administrative confinement. (*Id.*). Wilson, however, remained in administrative confinement due to pending disciplinary charges.

On October 10, 2017, Senior Classification Officer Robert Bulzer referred Wilson for assignment on Close Management based on the following:

> Inmate Wilson, Bernard DC #T24935 is recommended for Close Management based on his actions during an incident in B-Dorm on September 22, 2017. Following an incident involving several inmates, a camera review was initiated to determine what transpired and during the review, Inmate Wilson can be seen attempt[ing] to stab Inmate Eleby, Sylvester DC #K77423 with a homemade weapon. Additional intelligence was gathered regarding this incident and revealed that Inmate Wilson had entered into an agreement with a group of inmates and after Inmate Wilson refused to follow through on his end of the agreement, Inmate Eleby ordered a "hit" on Inmate Wilson. After learning that Inmate Eleby had ordered the "hit", Inmate Wilson attempted to carry out a pre-emptive strike on Inmate Eleby.

(Doc. 69, Attach. 7, Ex. G at 2).

On October 17, 2017, the ICT, consisting of Defendant Stephens, Officer Bulzer, and Defendant Childs held a Close Management review hearing and provided this summary:

> The team met with Inmate Wilson at his cell front in confinement and based upon the evidence presented, it is recommended that he be approved for CMI due to his behavior during the incident. During a review of the camera system, inmate Wilson can be seen attempt[ing] to stab Inmate Eleby, Sylvester DC #K77423 with a homemade weapon. Post incident, additional intelligence was gathered suggesting that Inmate Wilson attempted to carry out the preemptive strike on Inmate Eleby due to a hit Inmate Eleby ordered on him because of a bad deal. There were no injuries to staff during this incident.

(Doc. 69, Attach. 7, Ex. G at 2-3). The ICT recommended that Wilson be placed on Close Management I (CMI) status. (*Id*. at 2). On October 23, 2017, the SCO approved Wilson's assignment to Close Management II (CMII) status. (Doc. 69, Attach. 7, Ex. G).

During the time that prison officials were reviewing Wilson for Close Management, he was facing disciplinary charges for his role in the September 22, 2017, incident. On October 16, 2017, Wilson was convicted (pursuant to his no contest plea) of the disciplinary charge of Aggravated Battery on an Inmate, and was sentenced to 48 days in disciplinary confinement. (Doc. 69, Attach. 5, Ex. E and Attach. 8, Ex. H at 4). That same date, Wilson was convicted (pursuant to his no

contest plea) of the disciplinary charge of Fighting, and was sentenced to 30 days of disciplinary confinement. (Doc. 69 Attach. 6, Ex. F and Attach. 8, Ex. H at 4).

On November 2, 2017, Wilson was moved from administrative confinement to disciplinary confinement. (Doc. 69, Attach 8, Ex. H at 3). On December 28, 2017, Wilson was convicted of an additional disciplinary charge of Disobeying an Order and was sentenced to an additional 18 days in disciplinary confinement. (*Id.* at 4).

On January 6, 2018, while in disciplinary confinement, Wilson attended confinement recreation which consisted of four confinement cages. (Doc. 1 at 9 ¶ 8). Wilson was placed in the last cage. (*Id.*). Defendant Officer Tyler Johnson escorted Inmate Sadrack Cleus to Wilson's cage. (Doc. 1 at 9 ¶ 9). Officer Johnson knew of the prior fight between Cleus and Wilson, because he was informed of the fight on a previous occasion when he attempted to put Cleus and Wilson in the same recreation cage. (*Id.*). When Officer Johnson reached Wilson's cage with Inmate Cleus, Wilson informed Johnson that Cleus could not be placed in his cage. (*Id.*). Officer Johnson responded, "Stop being a bitch Wilson! Let's see how tough you are now!" (*Id.*). Johnson then placed Cleus inside Wilson's recreation cage, removed Cleus's cuffs, and walked away. (*Id.*). Cleus immediately attacked Wilson by striking him with a closed fist on the side of the head. The blow caused Wilson to fall backward onto the concrete, striking his head on the concrete. (*Id.*). Wilson got up and the two exchanged punches. (*Id.*).

Defendant James Revell was the disciplinary confinement housing supervisor responsible for supervising Wilson and Cleus in the recreation area. (Doc. 69, Attach. 2, Ex. B at 4). In Revell's Incident Report #120-18-01-053, Revell described, in relevant part:

> On January 6, 2018, I was assigned as I-dormitory Housing Supervisor. At approximately 11:20am, I was supervising Inmate Wilson, Bernard #T24935 cell I2-102 and Inmate Cleus, Sadrack #J57920 cell I2-121 in confinement recreation cages. Once inmate Cleus was placed in the recreation area and unrestrained[,] he ran towards Inmate Wilson and they began to strike each other with closed fist[s]. I gave both inmates several loud verbal commands to cease their actions, which they refused to comply. I broke the security seal on my issued MK4 OC chemical agent canister serial #4028. I then administered one continuous application of OC from MK4 Oleoresin Capsicum Crossfire chemical agent for a total of 27 grams in the direction of both inmates in an attempt to cease the altercation.

(*Id.*).

As part of the Use of Force Report concerning the January 6, 2018, altercation, Defendant Revell, Officer Ryan House, Defendant Officer Johnson, and Officer Chance Shuler completed Incident Reports describing the incident (composite Incident Report #120-18-01-053).[8] (Doc. 69, Attach. 2, Ex. B at 4-8). Defendant Officer Johnson and Officer Shuler reported, separately, that "[b]oth inmates DC6-229 file was reviewed prior to being pulled for recreation and no documentation was found to indicate that the two inmates could not be housed together or receive rec

---

[8] Neither Officer House nor Officer Shuler is named as a defendant in this case.

together." (Doc. 69, Attach. 2, Ex. B at 7, 8). Shift Supervisor Captain Billy Bennett confirmed that he "reviewed both inmates DC6-229 and found no documentation noted for staff to keep the two inmates separate or not house with each other." (Doc. 69, Attach. 2, Ex. B at 4-5). Warden Johnson reviewed the incident reports and "noted" the information. (Doc. 69, Attach. 2, Ex. B at 7, 8).

Form DC6-229 is the Daily Record of Special Housing. A DC6-229 is maintained for each inmate for the duration of his stay in disciplinary confinement. *See* Fla. Admin. Code r. 33-602.222(9)(a). Form DC6-229 is used by prison staff to document various activities on a daily basis, such as cell searches, recreation, showers, etc., and also "unusual occurrences." Fla. Admin. Code r. 33-602.222(9)(b).

As a result of the January 6, 2018, attack by Inmate Cleus, Wilson alleges that he "suffered a serious head and back injury." (Doc. 1 at 11 ¶ 13). Thirty minutes after the attack, Wilson was examined in the medical department where the only noted injury was mild swelling of his right thumb. (Doc. 69, Attach. 14, Ex. N at 83). Later that day, Wilson filed a sick-call request complaining: "I am in serious back pain and my head is pounding, my left eye is blurry and I keep throwing up. The right to middle side of my back is killing me and my right thumb is I think broken." (Doc. 69, Attach. 14, Ex. N at 80). Wilson reported that the problem started when he was "beat up today 1-6-18 at recreation." (*Id*.). Wilson was evaluated by

Page 20 of 52

the medical department on January 8, 2018. (*Id*. at 78-80). Staff noted that Wilson's gait was normal and that his back had no swelling or bruising. (*Id*. at 78). Wilson was prescribed acetaminophen and instructed to return if his symptoms continued or worsened. (*Id*. at 78-80).

On January 9, 2018, Wilson submitted another sick-call request complaining of intense headaches and back pain, and that his medication relieved the pain for only 45 minutes. (Doc. 69, Attach. 14, Ex. N at 75). The medical department ordered Wilson to continue his medications, massage his muscles, and report to prison staff any blurriness or swelling. (Doc. 69, Attach. 14, Ex. N at 74).

Wilson was transferred from Liberty CI to Suwannee CI on February 13, 2018. (Doc. 69, Attach. 14, Ex. N at 58). On March 6, 2018, Wilson submitted a sick-call request complaining of "excruciating" lower and upper back pain, migraines, and blurriness in his left eye. (Doc. 69, Attach. 14, Ex. N at 67). On March 8, 2018, medical staff ordered x-rays of Wilson's lumbar spine and sacrum. (Doc. 69, Attach. 14, Ex. N at 64-67). The x-ray was completed on March 13, 2018. (Doc. 69, Attach. 14, Ex. N at 64, 107).

In a report dated March 14, 2018, the radiologist concluded:

LUMBAR SPINE AP AND LAT

Results: Lumbar spine vertebral bodies are normal in height and alignment. No fracture or dislocation. Disc spaces are preserved. No

obvious pars defect. No spondylolisthesis. Soft tissue[s] are radiographically unremarkable.

Conclusion: Unremarkable lumbar spine radiographs.

SACRUM/COCCYX MIN 2V

Results: The sacrum and coccyx demonstrate no fracture or dislocation. Bony mineralization is within normal limits. Soft tissues are unremarkable.

Conclusion: No evidence of an acute osseous abnormality.

(Doc. 69, Attach. 14, Ex. N at 107). Wilson was prescribed ibuprofen and a topical analgesic for his back pain. (Doc. 69 Attach. 14, Ex. N at 60-61, 98).

In April 2018, Wilson's back pain was diagnosed as muscle spasms. (Doc. 69, Attach. 14, Ex. N at 57). Wilson describes his back pain as "long-term" and "intense" (Doc. 1 at 13 ¶ 17), and states that he "cannot sit down for a long period of time without his lower back causing him serious pain." (Doc. 1 at 11 ¶ 13). Wilson's continued complaints of back pain have been treated with a topical analgesic and ibuprofen or acetaminophen. (Doc. 69, Attach. 14, Ex. N at 7-10, 30-32, 41-43, 57, 60-62, 98).

## C.   **Facts Underlying Wilson's First Amendment Retaliation Claim**

Wilson alleges that after the January 6, 2018, attack, he submitted a grievance of a sensitive nature to the grievance lockbox "arguing the wrongful acts, and the attack that was caused by those acts." (Doc. 1 at 13 ¶ 16). On January 16, 2018,

Defendant Sergeant Flanagan came to Wilson's cell and warned him: "If you plan on suing my officers then you better think again!" (*Id.*). Flanagan then threatened to "gas" Wilson, and had Wilson placed in a shower while Flanagan searched Wilson's cell. (*Id.*). Wilson alleges that Flanagan ripped a pair of Wilson's gym shorts "to pieces" and destroyed a civil rights complaint he was drafting. (*Id.*). Afterward, Wilson "submitted a number of grievances concerning this issue." (*Id.*). Wilson states that Flanagan's threat of harm and retaliatory acts "place[d] great fear in the mind of Plaintiff." (*Id.*).

## III.  Summary Judgment Standard

Summary judgment is appropriate when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56(a) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). The court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See id.* An issue is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-moving party. *Id.*

## IV.   Analysis

The Defendants seek summary judgment on several grounds. (Doc. 69). The undersigned addresses the Fourteenth Amendment issue as a preliminary matter, followed by the qualified immunity defenses, and the remaining issues.

### A.   <u>Defendants Are Entitled to Summary Judgment on Wilson's Fourteenth Amendment Claims</u>

Defendants seek summary judgment on Wilson's Fourteenth Amendment claims on the grounds that his retaliation and deliberate indifference (*i.e.*, failure-to-protect) claims are covered by specific constitutional provisions—the First and Eighth Amendments—and, therefore, must be analyzed under those provisions instead of a substantive due process analysis. (Doc. 69 at 11). Wilson does not address this issue in his response. (Doc. 79).

"Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be

the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994)

(quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The Court clarified in

*United States v. Lanier*, 520 U.S. 259 (1997):

> [*Graham*] does not hold that all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments; rather, *Graham* simply requires that <u>if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process</u>.

*Lanier*, 520 U.S. at 272, n. 7 (emphasis added).

Wilson's retaliation and deliberate indifference claims are "covered by" the

First and Eighth Amendments. Accordingly, Wilson has no plausible substantive

due process claim grounded in the same conduct. Defendants are entitled to

summary judgment on Wilson's Fourteenth Amendment claims.

### B.   Defendants Warden Johnson, Assistant Warden Stephens, Classification Supervisor Comerford, Major Childs and Sergeant Revell Are Entitled to Qualified Immunity on Wilson's Eighth Amendment Claims

Wilson alleges that Defendants Warden Johnson, Assistant Warden Stephens,

Classification Supervisor Comerford, Major Childs, Sergeant Revell, and Officer

Johnson deprived him of his Eighth Amendment right not to face deliberate

indifference to a substantial risk of serious harm. All of these Defendants, except

Officer Tyler Johnson, seek summary judgment on the grounds that Wilson cannot

establish they violated the Eighth Amendment, and that they are entitled to qualified immunity. (Doc. 69 at 33 n.4) ("Defendants concede, that for purposes of this Motion **only**, that a dispute of fact exists as to whether Defendant Tyler Johnson would be entitled to Qualified Immunity.").

### 1.    *Qualified Immunity Standard*

"Under the qualified immunity doctrine, government officials performing discretionary functions are immune not just from liability, but from suit, unless the conduct which is the basis for suit violates clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Sanders v. Howze*, 177 F.3d 1245, 1249 (11th Cir. 1999) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To be entitled to qualified immunity, the defendant must first establish that he was acting within the scope of his discretionary authority." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (citing *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013)).

Once that is shown, and it is undisputed here, "the burden shifts to the plaintiff to establish that qualified immunity is not appropriate." *Id*. The plaintiff must prove that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would

understand that what he is doing is unlawful." *Dist. of Columbia v. Wesby*, 583 U.S.

___ , 138 S. Ct. 577, 589 (2018) (internal quotation marks and citations omitted).

Qualified immunity protects "all but the plainly incompetent or those who

knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

### 2.    *Eighth Amendment Standard*

"[P]rison officials have a duty . . . to protect prisoners from violence at the

hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (internal

quotation marks and citations omitted). However "not . . . every injury suffered by

one prisoner at the hands of another . . . translates into constitutional liability for

prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. It is

only a "prison official's deliberate indifference to a substantial risk of serious harm

to an inmate [that] violates the Eighth Amendment."  *Id*. at 828.

Whether an unsafe condition results in a substantial risk of harm is determined

using an objective standard. *See Farmer*, 511 U.S. at 834 (describing the objective

component of an Eighth Amendment claim based on a failure to prevent harm);

*Caldwell v. Warden, FCI Talladega,* 748 F.3d 1090, 1099 (11th Cir. 2014)

(explaining that "the court uses an objective standard" when examining the

"substantial risk of serious harm" element); *Cottone v. Jenne*, 326 F.3d 1352, 1358

(11th Cir. 2003) (holding that the risk "must be an objectively substantial risk of

serious harm"). There must be a strong likelihood of injury as opposed to a mere

possibility. *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990).

"The second element—the defendant's deliberate indifference to that risk—has two components: one subjective and one objective." *Caldwell,* 748 F.3d at 1099. The plaintiff "must show both that the defendant actually (subjectively) knew that an inmate faced a substantial risk of serious harm and that the defendant disregarded that known risk by failing to respond to it in an (objectively) reasonable manner." *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1320 (11th Cir. 2016); *Marsh v. Butler Cty., Ala.*, 268 F.3d 1014, 1027 (11th Cir. 2001) ("[O]fficials, to be liable, must be aware of a substantial risk of serious harm to the inmates and not take reasonable measures to alleviate that risk.").

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. Even if the plaintiff makes a sufficient showing of the defendant's subjective knowledge of a substantial risk, he still must make the additional showing that the defendant's response was objectively unreasonable. *Id*. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

Finally, a plaintiff must show that the constitutional violation caused his injury. *Cottone*, 326 F.3d at 1359. "[S]ection 1983 requires proof of an affirmative

causal connection between the actions taken by a particular person under color of state law and the constitutional deprivation." *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993). The constitutional deprivation must, in turn, be "a legal cause of [the plaintiff's] injuries." *Williams v. Bennett*, 689 F.2d 1370, 1381 (11th Cir. 1982).

### 3. *Application of Relevant Standards to Wilson's Eighth Amendment Claims*

#### a. <u>Warden Torrey Johnson Is Entitled to Qualified Immunity</u>

Wilson claims that Warden Johnson knew, from his personal review of the reports generated after the first attack on September 22, 2017, that Inmates Cleus, Downs, and Eleby posed a substantial risk of serious harm to Wilson. Wilson contends that Warden Johnson deliberately disregarded that risk by "refus[ing] to issue protection which would have placed plaintiff under protective management nor did he place a keep sep[a]rate against plaintiff and his attackers preventing any future potential threats of serious conflict." (Doc. 1 at 14 ¶ 20). Wilson claims that Warden Johnson's inadequate response caused him to be injured when Cleus attacked him on January 6, 2018. (*Id*.; *see also* Doc. 69 at 3-4).

On the evidence presented, no reasonable jury could find that Warden Johnson was deliberately indifferent to Wilson's safety. The evidence establishes that in response to the September 22, 2017, altercation, Warden Johnson directed the

classification department to initiate a Special Review between Wilson and Inmates Cleus, Towns, and Eleby. (Doc. 69, Attach. 9, Ex. I at 3). The Special Review is the very same "keep separate" designation Wilson now claims Warden Johnson should have initiated. Warden Johnson's personal participation in the Special Review decision ended at that point. Notably, Wilson was <u>approved</u> for Special Review status by the ICT (Defendants Stephens, Comerford and Childs) and the SCO (non-party R. Gould). Wilson's Special Review status against Cleus, Towns, and Eleby was the ultimate protection Wilson could receive from these individual inmates. *See* Fla. Admin. Code r. 33-601.211.

Concerning Protective Management, the undisputed facts in the summary judgment record establish that in response to Wilson's request for Protective Management, Warden Johnson reviewed Wilson's statement—including Wilson's claim that the September 22, 2017, incident "was not a fight but instead a hit put on me by the ZOES (gang)"—and directed the ICT to consider video footage of the incident in evaluating Wilson's request for Protective Management. (Doc. 69, Attach. 10, Ex. I at 15). That was the extent of Warden Johnson's personal participation in the Protective Management decision. The ultimate decision to disapprove Wilson for Protective Management was made by the ICT (Defendants Stephens, Comerford, and Childs) and the SCO (non-party R. Gould).

Given the fact that the ICT was responsible for reviewing and making final recommendations on Protective Management referrals, and also given the fact that the SCO was the ultimate decisionmaker on those matters, it was not unreasonable for Warden Johnson to refer the matter, which now included Wilson's claim that the September 22, 2017, altercation was a gang-related "hit," to the ICT for investigation, review, and recommendation.

Wilson asserts that a genuine factual dispute on the issue of Warden Johnson's liability arises from the officers' statements that Wilson's and Cleus's Special Review status was not documented on their DC6-229's (Daily Record of Special Housing) on January 6, 2018. (Doc. 79 at 6). Wilson contends that the officers' statements evidence Warden Johnson's "failure to document this Special review[.]" (Doc. 79 at 6). Accepting this failure-to-document allegation as true, it may demonstrate that Warden Johnson acted negligently, but it does not show that Warden Johnson acted with a "sufficiently culpable state of mind," because there is no evidence that Warden Johnson knowingly did not document the Special Review designations, or that he knew the Special Review designations were not documented on the DC6-229s. *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) ("[T]he prisoner must show that the defendant prison officials acted with a sufficiently culpable state of mind with regard to the condition at issue. The proper standard is that of deliberate indifference. Negligence does not suffice to satisfy this standard.");

Page 31 of 52

*Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) (noting that the deliberate indifference standard "is far more onerous" than the negligence standard); *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam) ("Merely negligent failure to protect an inmate from attack does not justify liability under [§] 1983.").

Wilson also asserts that a genuine factual dispute arises from Warden Johnson's failure to "<u>Highly</u> recommend[ ]" Wilson for Protective Management. (Doc. 79 at 3). Wilson alleges: "Being that Johnson was the Warden (overseer of all security operations of Liberty C.I.) he had the power to recommend P.M. status to Plaintiff. Such status would have clearly forewarned <u>ANY</u> staff member to not house, nor place any other inmate in the same rec. cage." (*Id.*).

Accepting Wilson's allegation as true—that Warden Johnson had the authority to make a PM recommendation to the ICT (as opposed to a mere referral), that "fact" does not reasonably support an inference that Warden Johnson's actions constituted deliberate indifference. At the time Warden Johnson reviewed Wilson's request for Protective Management, he already had referred Wilson for Special Review against Inmates Cleus, Towns, and Eleby. Wilson's request for Protective Management related additional allegations of a gang-related "hit"—allegations that were under investigation by Officer Deante McMillian as part of the Protective Management review. (Doc. 69, Attach. 10, Ex. J at 15). Warden Johnson directed

Page 32 of 52

staff to review video footage of the September 22, 2017, altercation "for supporting documentation," and to forward the footage "to ICT for review for protection needs." (*Id.*). Given that Wilson's additional gang-related allegations were under investigation, it was not unreasonable—let alone deliberately indifferent—for Warden Johnson to rely on the FDC's established Protective Management investigation and review process. Again, it was not Warden Johnson who disapproved Wilson for Protective Management. That recommendation was made by the ICT (comprised of Defendants Stephens, Comerford and Childs), and the ultimate decision to disapprove Wilson was made by the SCO. (Doc. 69, Attach. 10, Ex. J at 4, 5).

Based on the summary judgment evidence, a reasonable jury could not conclude that Warden Johnson was deliberately indifferent to Wilson's safety. Because Wilson fails to establish that Warden Johnson violated his constitutional rights, Warden Johnson is entitled to summary judgment based on qualified immunity.

> **b.** **Assistant Warden William Stephens, Classification Supervisor Melissa Comerford and Major Larry Childs Are Entitled to Qualified Immunity**

Wilson claims that the members of the ICT—Defendants Stephens, Comerford, and Childs—violated his clearly established rights under the Eighth Amendment when they failed to take reasonable measures to protect him after the

September 22, 2017, attack. (Doc. 1 at 15). Wilson alleges that these Defendants knew Inmates Cleus, Towns, and Eleby posed a substantial risk of serious harm to him because they reviewed the incident reports detailing the September 22, 2017, altercation, and they participated in the Protective Management review. Wilson claims that Stephens, Comerford, and Childs disregarded a substantial risk to his safety by failing to "place a keep sep[a]rate or Special Review status" on him, and by recommending that he not be approved for Protective Management. (Doc. 1 at 8, 15).

Defendants Stephens, Comerford, and Childs assert that the evidence establishes there was not a substantial threat to Wilson's safety, because after the September 22, 2017, attack: (1) Wilson was Special Reviewed from Inmates Cleus, Towns, and Eleby;  (2) Eleby was transferred; and (3) Wilson was under review for placement in Close Management. (Doc. 69 at 22). Defendants also argue that the evidence establishes that they were not deliberately indifferent to Wilson's safety, because: (1) they took reasonable steps to protect Wilson by approving the Special Review designation; and (2) they did not perceive that denying Wilson Protective Management posed a substantial threat to his safety given the Special Review designations, Eleby's transfer, and Wilson's referral for Close Management. (Doc. 69 at 22-23).

On the evidence presented, no reasonable jury could find that Stephens,

Comerford, or Childs was deliberately indifferent to Wilson's safety. The evidence establishes that in response to the September 22, 2017, altercation between Wilson and Inmates Cleus, Towns, and Eleby, these Defendants approved Special Review designations requiring that Wilson be kept separate from the other three inmates. If followed, Special Review was the highest, most individualized and permanent level of protection for Wilson against these particular inmates. Although Wilson asserts— as he did concerning Warden Johnson—that the lack of documentation of the Special Review status on his Daily Housing Record (DC6-229) for January 6, 2018, raises an inference of deliberate indifference, his argument fails for the reason outlined above. There is no evidence that Defendant Stephens, Comerford, or Childs <u>knowingly</u> did not document the Special Review designation, or that any one of them <u>knew</u> the Special Review designation was not documented on Wilson's Daily Housing Record for January 6, 2018. *Goodman*, 718 F.3d at 1332; *Brown*, 894 F.2d at 1537.

Concerning Protective Management, the evidence establishes that in response to Wilson's request for Protective Management, Stephens, Comerford, and Childs considered: (1) the circumstances of the September 22, 2017, incident, including the video footage of the incident; (2) Wilson's statements that the incident was gang-related and originated from Eleby putting a "hit" on Wilson; (3) the results of Officer McMillan's investigation of Wilson's allegations; (4) the fact that Eleby was

Page 35 of 52

transferred to a different institution; and (5) the fact that Wilson likely would not be released to the general population because he was referred for placement in Close Management. On this evidence, a reasonable jury could not infer that Stephens, Comerford, and Childs knew that Wilson was at substantial risk of serious harm if he was not placed in Protective Management.

Because a reasonable jury could not find that Defendant Stephens, Comerford, or Childs violated Wilson's constitutional rights, these Defendants are entitled to summary judgment based on qualified immunity.

### c.    Sergeant James Revell Is Entitled to Qualified Immunity

Wilson seeks to hold Defendant Sergeant Revell liable for Inmate Cleus's January 6, 2018, attack based on the theory that Revell "fail[ed] to properly operate and supervise confinement in I-dormitory." (Doc. 1 at 14 ¶ 21; *id.* at 9 ¶ 11). Wilson asserts that because Revell was the housing supervisor, he was "entitled . . . to be familiar with all inmate's reasons for placement in I-dorm confinement." (*Id.).* This "entitlement" to information, Wilson contends, supports the inference that Revell knew that Wilson was in confinement for fighting with Inmate Cleus and that the two could not be housed together. (*Id.*). Wilson contends that Revell disregarded this information, as well as the FDC's standard operating procedure requiring that two officers be present whenever a confinement inmate's cell is opened, when he failed

to stop Defendant Officer Johnson from placing Cleus in Wilson's recreation cage. (*Id.*).

The problem for Wilson is that there is no evidence that Defendant Revell subjectively was aware—prior to Cleus's January 6, 2018, attack—that Cleus posed a substantial risk of harm to Wilson. Wilson does not allege or identify any evidence showing that Revell <u>actually knew</u> of his prior fight with Cleus. Revell's name does not appear in any of the reports generated after the September 22, 2017, altercation. A reasonable jury could not infer awareness simply from Revell's status as housing supervisor. *See Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) ("[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.  Each individual Defendant must be judged separately and on the basis of what that person knows."). Furthermore, although Revell observed Defendant Officer Tyler Johnson place Cleus in Wilson's recreation cage, Wilson does not allege, nor does any evidence suggest, that Revell overheard Wilson tell Johnson that Cleus should not be housed with him.

Given the absence of evidence that Defendant Revell subjectively knew that Inmate Cleus posed a substantial risk of serious harm to Wilson, a reasonable jury could not find that Revell was deliberately indifferent to Wilson's safety. *See, e.g.,*

*Williams v. Sec'y, Dep't of Corr.*, 678 F. App'x 877, 882-83 (11th Cir. 2017).[9] (unpublished) (holding that plaintiff failed to state an Eighth Amendment claim against prison officials where he alleged merely that they failed to check his prison file before transferring him to a particular prison, failed to provide a safe classification system and failed to ensure that the prison classification board was in compliance with safety procedures) (citing *Chandler*, 379 F.3d at 1278; *Farrow v. West*, 320 F.3d 1235 (11th Cir. 2003)). Defendant Revell is entitled to summary judgment based on qualified immunity.

### C.   Defendant Sergeant Flanagan Is Not Entitled to Qualified Immunity from Wilson's First Amendment Retaliation Claim

Wilson claims that Defendant Sergeant Flanagan violated his First Amendment rights when he retaliated against Wilson for complaining about the January 6, 2018, attack, by threatening Wilson and damaging his property. (Doc. 1 at 13 ¶ 16). Defendant Flanagan asserts that Wilson's allegations, even taken as true, fail to state a plausible retaliation claim under the First Amendment, and that even if a violation were sufficiently alleged, that right was not clearly established. (Doc. 69 at 26-30, 33-34).

### 1.   *First Amendment Retaliation Standard*

---

[9] Unpublished decisions provide only persuasive authority and are not binding precedent. *See* 11th Cir. R. 36-2.

To state a claim for First Amendment retaliation, an inmate must establish three elements: (1) his speech was constitutionally protected; (2) the defendant's retaliatory conduct adversely affected the protected speech; and (3) there is a causal relationship between the retaliatory action and the protected speech. *See Douglas v. Yates*, 535 F.3d 1316, 1321 (11th Cir. 2008) (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005)). A prisoner's filing of a grievance concerning the conditions of his imprisonment is protected speech under the First Amendment. *Douglas*, 535 F.3d at 1321 (internal quotation marks and citation omitted); *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008).

To satisfy the second element, a plaintiff must suffer more than a "*de minimis* inconvenience" to his exercise of First Amendment rights. *Bennett*, 423 F.3d at 1252. The Eleventh Circuit employs an objective standard for measuring an adverse effect on speech: "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett*, 423 F.3d at 1253; *Smith*, 532 F.3d at 1277 ("Whether the discipline 'would likely deter' presents an objective standard and a factual inquiry."). Under this standard, a plaintiff need not show that the retaliatory conduct actually chilled his exercise of his First Amendment rights, rather, he need only show that the retaliatory acts likely would deter a person of ordinary firmness from exercising his First Amendment rights. *Bennett*, 423 F.3d at 1254. The plaintiff's

Page 39 of 52

actual response to the defendant's conduct, while not dispositive, "provides some evidence of the tendency of that conduct to chill First Amendment activity." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) (discussed favorably in *Bennett, supra*).

The third element—whether there was a causal connection between the retaliatory acts and the adverse effect on the speech—"asks whether the defendants were subjectively motivated to discipline because [the prisoner] complained of the conditions of his confinement." *Smith*, 532 F.3d at 1278.

### 2. *Application of Relevant Standards to Wilson's First Amendment Claim*

Wilson does not dispute that Defendant Flanagan was acting within the scope of his discretionary authority at the time of the allegedly unconstitutional conduct. Wilson, therefore, must show that Flanagan's actions violated the First Amendment and that this right was clearly established on January 16, 2018.

Viewing the evidence (and reasonable factual inferences drawn therefrom) in the light most favorable to Wilson, a reasonable jury could find that Wilson engaged in protected speech (filing a grievance and preparing a civil rights complaint) and that Flanagan's alleged acts (warning Wilson to "think again" about suing his officers, threatening Wilson with "gas," and destroying Wilson's shorts and draft complaint) were intended to deter Wilson from filing a lawsuit. Defendant Flanagan

does not argue otherwise. (Doc. 69 at 27-30). Rather, Flanagan asserts that he is entitled to summary judgment because: (1) a verbal threat, alone, does not violate the Constitution and there is no evidence that he followed through with his threat to "gas" Wilson;[10] and (2) Wilson fails to describe any effect that Flanagan's actions had on his exercise of his First Amendment rights. (Doc. 69 at 27-28, 30).

Threats of adverse action can support a First Amendment retaliation claim. *See, e.g., Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968) ("[T]he threat of dismissal from public employment is . . . a potent means of inhibiting speech."); *Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir. 2013) (concluding that a reasonable jury could find that threats by a correctional officer would chill a prisoner of ordinary firmness from engaging in the prison grievance process). More precisely, "threats alone can constitute an adverse action if the threat is capable of deterring a person of ordinary firmness from engaging in protected conduct." *Hill v. Lappin*, 630 F.3d

---

[10] A reasonable jury could understand Flanagan's alleged threat to "gas" Wilson to entail a threat to deploy oleoresin capsicum (also known as "pepper spray") or orthochlorobenzal malononitrile (also known as "tear gas" and "CS gas"). *See* Fla. Admin. Code r. 33-602.210(1)(e) ("CS—Orthochlorobenzal Malononitrile or Orthochlorobenzylidene Malononitrile—An irritant agent that causes a burning sensation and tearing of the eyes, nasal discharge, and skin and upper respiratory irritation."); Fla. Admin. Code r. 33-602.210(1)(p) ("OC—Oleoresin Capsicum (pepper spray)—An inflammatory agent that causes tearing and involuntary closing of the eyes, nasal discharge, sneezing, disorientation, and the sensation of respiratory distress. OC is the primary chemical agent to be utilized for cell extractions and other in-cell uses . . . .").

468, 474 (6th Cir. 2010); *Van Deelen v. Johnson*, 497 F.3d 1151, 1157 (10th Cir. 2007) (holding that a threat by a deputy sheriff to shoot the plaintiff would suffice to chill a person of ordinary firmness); *Bennett*, 423 F.3d at 1253 ("The plaintiffs' claim depends not on the denial of a constitutional right, but on the harassment they received for exercising their rights.").

The fact that an actor never carried out the threatened harm is of no moment. *Pittman v. Tucker*, 213 F. App'x 867, 871 (11th Cir. 2007) ("The . . . issue is not whether [the prison official] carried out the threat, but whether the alleged threat itself was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights."). "[T]he mere *threat* of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect." *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009). The person making a threat typically "hopes not to have to carry it out; one hopes that the threat itself will be efficacious. Most threats, indeed, are bluffs." *United States v. Velasquez*, 772 F.2d 1348, 1357 (7th Cir. 1985).

Further, as the Eleventh Circuit explained in *Bennett*, a plaintiff need not show that his own exercise of First Amendment rights has been "chilled." *Bennett*, 423 F.3d at 1254-55. The test is an objective one. *Smith v. Mosley*, 532 F.3d 1270, 1277 (11th Cir. 2008). A plaintiff can establish an injury by showing that the retaliatory acts are sufficiently adverse that a jury could find that the acts would chill *a person*

*of ordinary firmness* from exercising his First Amendment rights. *Bennett*, 423 F.3d at 1254-55. Thus, the fact that Wilson continued to file grievances, although potentially relevant, is not dispositive. *See Mirabella v. Villard*, 853 F.3d 641, 650 (3d Cir. 2017) ("We ask whether the act would deter a person of ordinary firmness, not whether the plaintiff was deterred."); *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (noting that the "objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits"); *Sanders v. St. Louis Cty.*, 724 F.2d 665, 666 (8th Cir. 1983) ("It is not necessary that the inmate succumb entirely or even partially to the threat . . . .").

Viewing the evidence in Wilson's favor, a reasonable jury could find that in the prison setting, Sergeant Flanagan's threat of spraying Wilson with a chemical agent, combined with his destruction of Wilson's property, would be sufficient to deter a person of ordinary firmness from complaining (either to prison administrators or to a court) about the January 6, 2018, attack. In January 2018, the law in this Circuit clearly established that prison officials may not retaliate against a prisoner for exercising his First Amendment right to complain about the conditions of his confinement. *Farrow*, 320 F.3d at 1248 ("The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech."); *Thomas v. Evans*, 880 F.2d 1235, 1241-42 (11th Cir. 1989). Accordingly, Defendant Flanagan is not entitled to summary judgment on Wilson's First Amendment

retaliation claim.

### D.   The Eleventh Amendment Bars Wilson's Official-Capacity Damages Claims

To the extent Wilson sues each Defendant in his official capacity for damages, (Doc. 1 at ¶ 18), the State of Florida is entitled to Eleventh Amendment immunity. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (reiterating that "absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court."). That "bar remains in effect when State officials are sued for damages in their official capacity." *Id*. Summary judgment on Wilson's official-capacity damages claims should be granted in favor of the Defendants.

### E.   Wilson Is Not Entitled to Injunctive Relief

Wilson's complaint demands the following injunctive relief: "barring housing in the Northern region's 1 and 2 of FL. D.O.C. due to fear of retaliatory acts." (Doc. 1 at 18). Wilson is not entitled to this injunctive relief for several reasons, the most obvious being that the only "retaliatory acts" he identifies are the acts of Defendant Flanagan. Because Wilson is no longer housed at Liberty CI, any claim for injunctive relief from Flanagan's retaliatory acts is moot. *Spears v. Thigpen*, 846 F.2d 1327, 1328 (11th Cir. 1988) (holding that claims regarding treatment at a facility at which prisoner was no longer incarcerated were moot); *Zatler v. Wainwright*, 802 F.2d 397,

399 (11th Cir. 1986) (holding that inmate's release from prison mooted claims for declaratory and injunctive relief); *Wahl v. McIver*, 773 F.2d 1169, 1173 (11th Cir.1985) (explaining that absent class certification, an inmate's claim for injunctive relief under § 1983 action is moot once the inmate has been transferred); *see also United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1358 (11th Cir. 2019) ("[T]o obtain an injunction, the plaintiff must establish by a preponderance of the evidence that this form of equitable relief is necessary.").

In addition, to the extent Wilson seeks injunctive relief against the Florida Department of Corrections, he is not entitled to such relief because he has not demonstrated that the constitutional violation at issue was caused by an official policy or custom. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978) (articulating the requirements for an official-capacity claim).

### F.    Wilson Is Not Barred from Recovering Compensatory and Punitive Damages Against Defendant Officer Tyler Johnson, but Is Barred from Recovering Such Damages Against Defendant Flanagan

Wilson asserts that as a result of the failure to protect him, he incurred a serious back injury from the January 6, 2018, attack, resulting in chronic back pain. Wilson seeks to recover $50,000 in compensatory and punitive damages. (Doc. 1 at 18). Wilson alleges no physical injury resulting from Defendant Flanagan's retaliation. The Defendants move for summary judgment on Wilson's claims for compensatory and punitive damages on the grounds that the evidence in the

summary judgment record, including Wilson's medical records, demonstrates that Wilson did not suffer greater than a *de minimis* physical injury as required under 42 U.S.C. § 1997e(e). (Doc. 69 at 39-41).

Wilson's summary judgment response asserts: "Back pain cannot be detected by any medical equipment." (Doc. 79 at 8). Wilson contends that his allegation that he has suffered back pain for over a year is, of itself, sufficient to create a jury question on the issue of whether he suffered more than a *de minimis* physical injury from the January 6, 2018, attack. (*Id*.). Wilson concludes that Defendants are not entitled to summary judgment because they "are unable to scientifically refute Plaintiff's back injuries in as much [sic] that he is the only one who feels the pain." (*Id*.).

### 1.    *The PLRA's Limitation on Compensatory and Punitive Damages*

The Prison Litigation Reform Act provides, "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury. . . ." 42 U.S.C. § 1997e(e). "[T]he phrase 'Federal civil action' means all federal claims, including constitutional claims." *Napier v. Preslicka*, 314 F.3d 528, 532 (11th Cir. 2002).

The Eleventh Circuit addressed the implications of section 1997e(e) in *Harris v. Garner* ("*Harris I*"), 190 F.3d 1279, 1286 (11th Cir. 1999), *vacated*, 197 F.3d 1059 (11th Cir. 1999), *reinstated in relevant part*, 216 F.3d 970, 972, 985 (11th Cir. 2000) ("*Harris II*"). The court held that § 1997e(e) applies to constitutional claims by prisoners. *Harris II*, 216 F.3d at 984-85. The court further held that in order to satisfy § 1997e(e), a prisoner must allege more than a *de minimis* physical injury. *Harris I*, 190 F.3d at 1286-87 (holding that "in order to satisfy section 1997e(e) the physical injury must be more than *de minimis*, but need not be significant."). The *Harris* Court "did not distinguish between cases in which a prisoner pleads a "mental or emotional injury" and those where a prisoner does not so plead." *Al-Amin v. Smith*, 637 F.3d 1192, 1196-97 (11th Cir. 2011) (examining *Harris I*).

The Eleventh Circuit acknowledged, very recently, that a "survey of this Court's precedent, as well as our sister circuits', reveals no consensus for how to determine when a physical injury is 'greater than de minimis.'" *Thompson v. Smith*, No. 18-11671, 2020 WL 1189387, at *9 (11th Cir. Mar. 12, 2020) (unpublished). The court noted that injuries that are clearly insufficient are those that "attest to a routine discomfort associated with confinement." *Id*. at *9 (discussing *Alexander v. Tippah Cty.*, 351 F.3d 626, 631 (5th Cir. 2003); *Harris I*, 190 F.3d at 1287)).

This action, brought by Wilson under 42 U.S.C. § 1983, is a "Federal civil action." *See* 42 U.S.C. § 1997e(e); *Napier, supra*. It is evident from the face of

Wilson's complaint that he was a prisoner at the time he filed this action, and that the harm of which he complains occurred while he was in custody. Wilson seeks compensatory and punitive damages for the alleged violation of his constitutional rights. Wilson, therefore, must show that he suffered more than a *de minimis* physical injury to overcome § 1997e(e)'s bar. *See Harris I*, 190 F.3d at 1286-87, 1290; *Al-Amin*, 637 F.3d a 1197 (confirming that § 1997e(e) applies to all claims seeking compensatory or punitive damages for constitutional injury, regardless of whether the prisoner pleads, or seeks redress for, a "mental or emotional injury").

There is no genuine dispute that the temporary, mild swelling of Wilson's thumb after the January 6, 2018, attack was a *de minimis* physical injury. The parties disagree, however, whether Wilson's allegations of chronic back pain create a genuine factual dispute about whether he suffered more than a *de minimis* physical injury. The evidence, viewed in its entirety, is sufficient for a reasonable jury to find that Wilson's alleged injury—being hit with closed fists, which caused him to fall backwards onto a concrete slab and resulting in continued lower back pain that has lasted for over one year and is being treated with pain relievers and analgesic balm— is not a "routine discomfort" associated with confinement, and amounts to a greater than *de minimis* physical injury. *See Thompson*, 2020 WL 1189387 at *7-10 (concluding that prisoner's alleged injury—"being pepper sprayed and made to sit with the chemical agents on him for nearly twenty minutes, forced to take an

extended shower to allow the chemicals to run into sensitive crevices of his body, and returned to a cell contaminated with pepper spray for the rest of that day and part of the following day"—amounted to a greater than *de minimis* physical injury under § 1997e(e)); *Stallworth v. Wilkins*, No. 18-12445, 2020 WL 261659, at \*4 (11th Cir. Jan. 17, 2020) (unpublished) (concluding that inmate who alleged that mold and filth on his meal trays caused him "to have a few stomach viruses, throw up, fever, and constipation" for which he went to sick call twice and sought medical attention a third time, made a showing of physical injury that was not merely *de minimis*); *Benoit v. Bordelon*, 596 F. App'x 264, 269 (5th Cir. 2015) (holding that the district court did not clearly err in finding that back pain, "which persisted at least a year, was more than de minimis"); *Thompson v. Sec'y, Fla. Dep't of Corr.*, 551 F. App'x 555, 557 n.3 (11th Cir. 2014) (observing that the *de minimis* standard has been met by "an observable or diagnosable medical condition requiring treatment by a medical care professional" and concluding the plaintiff had "alleged enough to avoid dismissal at this stage"). *But see Mann v. McNeil*, 360 F. App'x 31, 32 (11th Cir. 2010) (holding that § 1997e(e)'s standard was not satisfied where prisoner alleged vague injuries to his back and scrapes and marks on his legs); *Quinlan v. Personal Trans. Servs. Co.*, 329 F. App'x 246, 248-49 (11th Cir. 2009) (same, where asthmatic pretrial detainee alleged temporary chest pain, headache, difficulty breathing and "continuous back pain in [his] lower back that periodically

Page 49 of 52

cause[d] [him] to walk hunched over"); *Dixon v. Toole*, 225 F. App'x 797, 799 (11th Cir. 2007) (same, where prisoner, after being forced to sleep in "strip cell" on a concrete platform, claimed an aggravation of preexisting injuries).

Accordingly, Defendant Tyler Johnson is not entitled to summary judgment on Wilson's claim for compensatory and punitive damages. Defendant Flanagan, however, is entitled to summary judgment on the issue of compensatory and punitive damages, because Wilson alleges no physical injury resulting from Flanagan ripping his shorts and legal document. *See Al-Amin, supra*.

### G.    Wilson Is Not Entitled To Attorney's Fees As A *Pro Se* Litigant

Because Wilson is proceeding *pro se*, he cannot recover attorney's fees even if he is the prevailing party. *See Kay v. Ehrler*, 499 U.S. 432 (1991) (holding that a *pro se* litigant cannot be awarded attorneys' fees under 42 U.S.C. § 1988). This ruling is without prejudice to Wilson reasserting his claim for attorney's fees under 42 U.S.C. § 1988, if counsel appears on Wilson's behalf and Wilson prevails on one or more claims.

## III.    Conclusion

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that:

    1.    Defendants' motion for summary judgment (Doc. 69) be **GRANTED IN PART** to the following extent:

a.     Summary judgment be granted in favor of all Defendants on Wilson's Fourteenth Amendment claims;

b.     Summary judgment be granted in favor of all Defendants on Wilson's official-capacity claims;

c.     Summary judgment be granted in favor of Defendants Warden Torrey Johnson, Assistant Warden William Stephens, Classification Supervisor Melissa Comerford, Major Larry Childs and Sergeant James Revell on Wilson's individual-capacity Eighth Amendment claims;

d.     Summary judgment be granted in favor of all Defendants on Wilson's claim for injunctive relief; and

e.     Summary judgment be granted in favor of Defendant Sergeant Heath Flanagan, under 42 U.S.C. § 1997e(e), on Wilson's individual-capacity claim for compensatory and punitive damages.

2.     Defendants' motion for summary judgment (Doc. 69) be **DENIED** in all other respects.

At Panama City, Florida, this <u>31st</u> day of March, 2020.

<u>/s/</u> *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**